Andrew G. Deiss (Utah Bar No. 7184)
John Robinson Jr. (Utah Bar No. 15247)
Brenda E. Weinberg (Utah Bar No. 16187)
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
Tel: (801) 433-0226
adeiss@deisslaw.com
jrobinson@deisslaw.com
bweinberg@deisslaw.com
*Attorneys for the Plaintiff*

---

## IN THE FOURTH DISTRICT COURT, PROVO DIVISION
## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| **IBC ADVANCED TECHNOLOGIES, INC.,** | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| *Plaintiff*, | |
| vs. | Case No. |
| **6th WAVE INNOVATIONS CORP,** a Utah corporation, and **MICHAEL L. SCHRIDER,** an individual, | Tier III |
| *Defendants*. | |

Plaintiff IBC Advanced Technologies, Inc., by and through their

undersigned counsel, submit this Motion for Temporary Restraining Order

and Preliminary Injunction, seeking a temporary restraining order and

injunctive relief against Defendants 6th Wave Innovations Corp and

Michael L. Schrider as follows.

## TABLE OF CONTENTS

INTRODUCTION AND RELIEF REQUESTED ................................3

STATEMENT OF FACT ....................................................................8

ARGUMENT ...................................................................................13

   I.  IBC is Entitled to Injunctive Relief Under Utah R. Civ. P. 65A.   15

    **(1)  IBC Will Suffer Irreparable Harm Unless the Court Grants the Injunctive Request.** .....................................................16

      **A.   Presumption of Harm for Misappropriation of IBC's Trade Secrets** ................................................................................16

    **(2)   The Threatened and Ongoing Injury to IBC Outweighs Any Damage the Injunctive Request Could Cause to Defendants.** ...................................................................................21

    **(3)   The Injunctive Request Would Not Be Adverse to the Public Interest.** .............................................................................22

    **(4)   There is a Substantial Likelihood IBC Will Prevail on Its Claims Against Defendants or, At Least, the Case Presents Serious Issues on the Merits Which Should Be the Subject of Further Litigation.** .........................................................................23

      **A.   Schrider Has Breached the NDA.** ...............................23

      **B.   Schrider and 6th Wave Have Misappropriated IBC's Trade Secrets, or Have Threatened Misappropriation of IBC's**

**Trade Secrets, as Defined Under the UTSA.**..........................31

    **C.   Schrider and 6th Wave Have Been Unjustly Enriched.**
    56

CONCLUSION....................................................................................59

## INTRODUCTION AND RELIEF REQUESTED

Using false pretenses, Michael L. Schrider ("Schrider")

misappropriated IBC's core trade secrets.   On December 8, 2015, he first

traveled to Utah as an "independent contractor" at the request of Ucore

Rare Metals, Inc. ("Ucore") to evaluate IBC's flagship technology, Molecular

Recognition Technology ("MRT").   He met with IBC only after entering into

a non-disclosure agreement (the "NDA") with IBC that he never intended

to honor.   Despite public accusation, he has never denied that he

misappropriated IBC's trade secrets and confidential information, as any

innocent person would.   He has never denied it – even in the face of

IBC's clear and public demands that he return them.

Instead, having been rewarded for his theft by being appointed Chief Operating Officer for Ucore and receiving 200,000 stock options, he now publicly threatens to share IBC's Confidenmtial Information and trade secrets with IBC competitors.   These threats are not made with a whisper but, rather, are made with a bullhorn --  in press releases after press release. He has publicly announced that the company for which he is now COO is in the process of building a new alliance with one or more other companies *based* upon IBC's technology.

This alliance is not slated to occur merely at some future date.   No, trumpets Shrider, it will be "happening very quickly."   Just in the past few weeks, Shrider has almost scoffingly announced that Ucore is making special efforts to "expedite its anticipated ramp-up" with its "largely 'off the shelf' technology which can be deployed with little or no delay" in order to obtain United States federal and state funding.   Ucore's purported "off the shelf" technology refers specifically to IBC's MRT.    Specifically, MRT he

claims,  is to be used in hybrid combination with other technologies

This "Hybrid SX." amounts to"[t]he combination of SX and **MRT**

suggests a layering of nanotechnology on top of traditional SX, delivering

a derivative technology ('Hybrid SX') that is theoretically the best of all

worlds." To be clear, MRT does not refer to a generalized technology of

which IBC has a specific type.  No, MRT is unique to IBC.  It is

proprietary. Even the term "MRT" is IBC's trademarked property.

One of the partners with whom IBC intends to partner is obvious –

Defendant 6th Wave Innovations Corp. ("6th Wave").  6th Wave is one of

the only, if not **the** only, company that uses "nanotechnology" to extract

metals from the earth and Ucore has stated in the past that it was

considering partnering with 6th Wave.   6th Wave, like IBC, is

headquarted in Utah.

It might seem counter-intuitive that a person who stole trade secrets

would seek to let the world know of his misdeeds.  In this case, however,

Shrider's public disclosure has been made to facilitate Ucore's current rights offering (the "Rights Offering") to holders of its common shares in Canada and the United States. Ucore is slated to realize gross proceeds of $28.41 million if it sells the shares available through the Rights Offering. The benefit to Schrider and 6th Wave is obvious and significant.

The immediacy of the irreparable harm that would be caused by Shrider and 6th Wave's plans is patent.  Accordingly, Plaintiff formally requests that the Court grant the following injunctive relief:

1. Defendants shall be enjoined from misappropriating IBC's Confidential Information and trade secrets;
2. Defendants shall maintain the secrecy and confidentiality of IBC's Confidential Information and trade secrets and other proprietary information, including restraint from disclosing such information to the public, Defendants' past, current, prospective, or future business associates, investors, subsidiaries, and acquaintances;
3. Defendants shall account for and return, and cause all parties to whom they have disclosed any trade secrets or Confidential Information to account for and return, to IBC all IBC intellectual property, including its trade secrets, Confidential Information and other confidential documents, data or information in their possession, custody or control, including any copies thereof or

6

any documents, data or information that references or uses in any way IBC's Confidential Information and trade secrets;

4. Defendants shall return, and refrain from using, all Confidential Information and trade secrets pursuant to the Nondisclosure Agreement; and

5. Defendants shall be precluded from in any way conducting, transacting any business with, or assisting any person or entity that utilizes or seeks to utilize IBC's Confidential Information and trade secrets.

(collectively referred to hereinafter as the "Injunctive Request"). Plaintiff respectfully requests that the Court prohibit the foregoing conduct.   Each item is intended to maintain the status quo while this matter is resolved.

These remedies requested below are warranted and essential to protect Plaintiff from Defendants' intentional conduct, including: misappropriation of IBC's Confidential Information and trade secrets and their disclosure to third parties including competitors of IBC and the widespread campaign of misinformation and disparagement that has damaged and threatens to further IBC's goodwill with existing and potential clients. Plaintiff is entitled to injunctive relief based on 1) Utah R. Civ. P.

65A, 2) the injunctive relief provisions within the NDA, and 3) the injunctive relief provisions under the Uniform Trade Secrets Act ("UTSA"). The Court should enter a temporary restraining order and preliminary injunction consistent with the relief requested below.

## STATEMENT OF FACTS

1.      IBC was founded in 1988 as a Utah corporation and was named after Reed M. Izatt, Jerald S. Bradshaw, and James J. Christensen, three distinguished Brigham Young University professors with prominent international reputations and experience in macrocyclic chemistry, selective metal ion separations, and Molecular Recognition Technology (MRT).

2.      IBC's customers and business associates possess sophisticated scientific and technical expertise, such that they belong to a niche of highly sophisticated scientists and engineers that use specialized

technical knowledge to harness the distinctive features of MRT, including in the mining and metallurgical industry.

3.     In December 2015, Schrider was an independent contractor consultant of Ucore, a company with whom IBC has executed a number of agreements that include confidentiality provisions to protect IBC's trade secrets and Confidential Information.

4.     Ucore describes itself as a development-phase company focused on rare and critical metals resources, extraction and beneficiation technologies, with a vision and plan is to transition to become a leading advanced technology company that provides mineral separation products and services to the mining and mineral extraction industry.

5.     Ucore creates no products, possesses no intellectual property, has no sources of revenue, is entirely dependent upon investments and loans to survive, and does not have sufficient funds to put any of its resources interests into production from its own financial resources.

6.      Because Ucore lacked its own capabilities, it engaged IBC. Only by directing Schrider to enter into the NDA with IBC did Ucore gain access to IBC's trade secrets, intellectual property, and other Confidential Information.

7.      Now, Ucore is brazenly seeking funding and support from the United States Government and Alaska State Government to develop a mine in Alaska ("Bokan Mine") through the misappropriation of IBC's trade secrets and Confidential Information.

8.      Ucore has met with United States Senators "to discuss Ucore's promise as a secure domestic supply source of HREE crucial to U.S. defense, manufacturing, and industrial needs." In truth, Ucore and Schrider are a real and immediate threat to the people of this country, with clear intent to exploit American tax dollars and steal American technology.

9.     Ucore sent Schrider to Utah to inspect the Pilot Plant as part

of a fake "due diligence" process purportedly in connection with a

contemplated joint venture between Ucore and IBC.

10.     To assure IBC that its trade secrets and Confidential

Information would remain protected during Schrider's supervision, Schrider

entered into a Nondisclosure Agreement ("NDA") on December 8, 2015.

Schrider executed the NDA to spuriously gain access to IBC's Confidential

Information and trade secrets.[1]

11.     Ucore requested the NDA from IBC and had Schrider sign it.[2]

12.     Ucore sent Schrider to Utah frequently to monitor and assess

IBC's technical work and gather economic and engineering data.[3]

[1] [Schrider NDA, Ex. 1.]
[2] [Izatt Dec., Ex. 2, ¶ 4.]
[3] [Izatt Dec., Ex. 2, ¶ 5.]

13.     While at IBC's headquarters, Schrider gathered data related to IBC's MRT systems, including material balances, flow sheets, engineering drawings, and other Confidential Information.[4]

14.     From December 2015 to September 2017, Schrider traveled to IBC's headquarters in Utah 16 times, specifically to gather trade secrets and Confidential Information from IBC in furtherance of a scheme to misappropriate IBC's trade secrets. [5]

15.     Schrider became Chief Operating Officer of Ucore in February 2018. Now, Ucore has made it known that it intends to misappropriate IBC's trade secrets in order to profit handsomely at the expense of IBC.

16.     6th Wave describes itself as a nanotechnology company focused on extraction and detection of target substances at the molecular level, whose main laboratory is located in Salt Lake City, Utah.

[4] [Izatt Dec., Ex. 2, ¶ 6.]
[5] [Izatt Dec., Ex. 2, ¶ 5.]

17.    Ucore previously threatened IBC that Ucore could simply work with 6th Wave. Jim McKenzie, CEO of Ucore, told IBC that 6th Wave "does exactly what IBC does."[6]

18.    6th Wave is a direct competitor of IBC.[7]

19.    It appears that Schrider's colleagues at Ucore now work for 6th Wave.[8]

20.    Ucore even owns the domain name 6thwave.com.[9]

## ARGUMENT

Plaintiff seeks injunctive relief, ordering Defendants and their agents to act as set forth in the Injunctive Request. These remedies are warranted and essential to protect Plaintiff's intellectual property, Confidential Information, and trade secrets. Plaintiff is entitled to injunctive relief under four separate legal bases:

[6] [Izatt Dec., Ex. 2, ¶ 6.]
[7] [Izatt Dec., Ex. 2, ¶ 7.]
[8] [Discussion Boards, Ex. 3; Manuel ZoomInfo Profile, Ex. 4.]
[9] [6thwave.com WHOIS Information, Ex. 5.]

1) Utah R. Civ. P. 65A, enjoining:

    a. Actual or threatened misappropriation of IBC's trade secrets,

    b. Maintenance of the secrecy and confidentiality of IBC's trade secrets and other proprietary information;

2) Provisions within the NDA, enjoining:

    a. Maintenance of the secrecy and confidentiality of IBC's trade secrets and other proprietary information,

    b. Return of all Confidential Information;

3) The Uniform trade secrets Act ("UTSA"), enjoining:

    a. Actual or threatened misappropriation of IBC's trade secrets, and

    b. Maintenance of the secrecy and confidentiality of IBC's trade secrets and other proprietary information.

The Court should enter a preliminary injunction consistent with the relief requested above.

Actual or threatened misappropriation of trade secrets may be enjoined under the UTSA. Utah Code § 13-24-3. The purpose of a preliminary injunction is to prevent "a threatened wrong" or stop a "continuing" wrong.   *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 428 (Utah 1983) (simplified). Furthermore, a preliminary injunction "serves to preserve the status quo pending the outcome of the case." *Hunsaker v.*

14

*Kersh*, 1999 UT 106, ¶ 8 (simplified). "Even if the defendant has ceased wrongful activities, an injunction should be granted where defendant's intentions are in doubt." *InnoSys, Inc. v. Mercer*, 2015 UT 80, fn. 22. Here, the facts satisfy each of the requirements necessary to grant the relief sought by the Injunctive Request.

**I.   IBC is Entitled to Injunctive Relief Under Utah R. Civ. P. 65A.**

Injunctive relief is available when four requirements are satisfied:

(1) The applicant will suffer irreparable harm unless the order or injunction issues;

(2) The threatened injury to the applicant outweighs whatever damage the proposed order or injunction may cause the party restrained or enjoined;

(3) The order or injunction, if issued, would not be adverse to the public interest; and

(4) There is a substantial likelihood that the applicant will prevail on the merits of the underlying claim, or the case presents serious issues on the merits which should be the subject of further litigation.

Utah R. Civ. P. 65A(e). All four requirements are met here.

**(1) IBC Will Suffer Irreparable Harm Unless the Court Grants the Injunctive Request.**

The relief sought by the Injunctive Request is necessary to prevent the continuing and threatened irreparable harm Plaintiff will suffer if Defendants are allowed to continue interfering with IBC's business, including the misappropriation of its trade secrets.  The relief sought by the Injunctive Request will also serve to preserve the status quo.  The Utah Supreme Court has recognized that "[l]oss of business and goodwill may constitute irreparable harm susceptible to injunction." *Hunsaker v. Kersh*, 1999 UT 106, ¶ 10, 991 P.2d 67; *see also System Concepts, Inc. v. Dixon*, 669 P.2d at 428.

**A. Presumption of Harm for Misappropriation of IBC's Trade Secrets**

In the context of trade secret misappropriation, there is a presumption of harm. "A long-settled principle of trade secret law

recognizes a presumption of harm upon proof of misappropriation. Over the years, courts have often ruled that a trade secret claimant is entitled to a rebuttable presumption of irreparable harm for the purposes of injunctive relief . . . .'" *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 34. "This principle is well-ingrained in the caselaw under the UTSA and under related Utah cases. The presumption of irreparable harm is widely endorsed and rarely questioned." *Id.* at ¶ 35. "[W]hen a plaintiff seeks an injunction in a case involving trade secrets, there is a presumption of a threat of future harm rather than merely a presumption that any harm would be irreparable." *Id.* at ¶ 75. Once there is a presumption, the burden shifts to the defendant "to carry the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at ¶ 43 (simplified). "If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [plaintiff] substantial protection." *Id.* at ¶ 44, quoting

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir.1986).

District courts have granted injunctions where a company's inability to pay damages constituted irreparable harm. *See Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). There is evidence that Schrider and his company Ucore are unable to pay monetary damages. Ucore creates no products, possesses no intellectual property, and has no sources of revenue; it is entirely dependent upon investments and loans to survive. Ucore's own most recent financial disclosures state that "[Ucore] does not generate any revenue and does not have sufficient funds to put any of its resources interests into production from its own financial resources. [Ucore] also does not currently have sufficient funds to acquire IBC pursuant to the

18

option agreement."[10] Outlined below are selected financial results for the

past three years from Ucore's audited financial statements:

| | for the year ended December 31, 2018 CA$ | for the year ended December 31, 2017 CA$ | for the year ended December 31, 2016 CA$ |
|---|---|---|---|
| Net Loss | (4,765,630.00) | (4,883,342.00) | (5,396,390.00) |
| Loss per share- basic and diluted | (0.02) | (0.02) | (0.02) |
| Retained Deficit | (47,478,840.00) | (42,713,210.00) | (37,829,868.00) |

### B.  Preservation of Leverage

Lastly, restrictive covenants in contracts empowering a party with

leverage are grounds for an injunction. *See Zagg, Inc. v. Harmer*, 2015

UT App 52, ¶ 12. In *Zagg*, the parties entered into an agreement with a

provision that Defendant Harmer could not sell approximately 80,000 of his

shares of Zagg stock. *Id.* at ¶ 3. Zagg sought a temporary injunction to

[10] [Ucore 2019 Q2 MD&A, Ex. 12, p. 27.]

prevent Harmer from selling the stock pending the resolution of the parties'

claims. *Id.* The district court denied Zagg's request for an injunction,

concluding that the threatened harm to Zagg is quantifiable in money

damages and is therefore not irreparable. *Id.* The Utah Court of Appeals

determined that the district court exceeded its discretion in denying the

injunction, reasoning that "[t]he negotiation of such a covenant inevitably

involves a second bargained-for benefit: That is leverage… Such a power

can be of material commercial advantage. When it is bargained for, as it

was in connection with the issuance and placement of the subject notes, it

cannot fairly be ignored by a court." *Id.* at ¶ 12 (internal quotations

omitted), quoting *Boesky v. CX Partners, LP*, CIV. A. Nos. 9739, 9744,

9748, 1988 WL 42250 (Del.Ch. Apr. 28, 1988). "[N]o award of money

damages could be reliably calculated to compensate [] for the loss of this

leverage." *Id.* at ¶ 13. Here, IBC will be irreparably harmed by the loss of

bargained-for leverage if Schrider is not enjoined from disclosing trade secrets and Confidential Information in violation of the NDA.

**(2) The Threatened and Ongoing Injury to IBC Outweighs Any Damage the Injunctive Request Could Cause to Defendants.**

The actual damage and potential damage to IBC of allowing Defendants to continue to disrupt IBC's business operations and destroy existing and potential client relationships are significant if Defendants are permitted to disparage IBC, unfairly compete through the misappropriation of IBC's trade secrets, and undermine IBC's business. In contrast, the action requested by the Injunctive Request will cause no or minimal (but justified) harm to Defendants. Schrider does not own the rights to IBC's intellectual property and has not paid to license it. It is unlikely that the injunction would hinder 6th Wave's continued ability to do business, as it operates in industries such as cannabinoid extraction that, IBC believes, do not utilize or adapt IBC's trade secrets.

**(3) The Injunctive Request Would Not Be Adverse to the Public Interest.**

By granting the preliminary injunction requested by Plaintiff, the Court will be promoting the public interest in that it will facilitate the continued operation and survival of an American business, possessing essential technology contemplated by the implementation of Executive Order 13817, and prevent Defendants from causing any further harm to IBC.[11] Preventing the needless waste and possible destruction of IBC's business and misappropriation of IBC's trade secrets and Confidential Information is not adverse to the public interest. Indeed, it would be contrary to the public interest to allow such conduct to continue.

---

[11] Pursuant to Executive Order 13817, "A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals," the Secretary of the Interior has identified 35 mineral commodities deemed critical, which include the platinum group metals and the rare earth elements group. [Federal Register, Vol. 83, No. 97, Friday, May 18, 2018, https://www.federalregister.gov/d/2018-10667]

**(4) There is a Substantial Likelihood IBC Will Prevail on Its Claims Against Defendants or, At Least, the Case Presents Serious Issues on the Merits Which Should Be the Subject of Further Litigation.**

The final requirement for injunctive relief is satisfied when "the case presents serious issues on the merits which should be the subject of further litigation." Utah R. Civ. P. 65A(e)(4). Plaintiff's claims for misappropriation of trade secrets, breach of contract, and unjust enrichment clear this low bar, and Plaintiff has a substantial likelihood of prevailing on the merits of these underlying claims. *See id*. Alternatively, the final requirement for injunctive relief is satisfied when "[t]here is a substantial likelihood that the applicant will prevail on the merits of the underlying claim." Utah R. Civ. P. 65A(e)(4).

**A. Schrider Has Breached the NDA.**

In order to recover damages, IBC must prove each of these four things:

(1) that there was a contract between IBC and Schrider;

23

(2) that IBC did what the contract required it to do;

(3) that Schrider breached the NDA by not performing his obligations; and

(4) that IBC was damaged because Schrider breached the contract.

*Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14. Each element is satisfied here.

Schrider agreed to and signed the NDA in exchange for access to IBC's trade secrets and Confidential Information.[12] IBC performed its duties and obligations under the NDA by granting Schrider access to its trade secrets and Confidential Information.[13] Pursuant to the NDA,

> "Confidential Information" means all proprietary business, commercial, technical and other information that is disclosed by IBC to Schrider. This Confidential Information may include, without limitation, information relating to any of IBC's products, systems using IBC products, Molecular Recognition Technology (MRT), separations and other technologies, manufacturing processes, raw materials, product chemical composition, designated product names or numbers, formulations, costs, selling prices, vendors, engineering designs, drawings, concepts, machinery, technical

[12] [Schrider NDA, Ex. 1.]
[13] [Izatt Dec., Ex. 2, ¶ 4.]

> specifications, reports, plans, operations, policies and
> procedures, quality control, research, development, inventions,
> manufacturing, applications, trade secrets, know-how,
> purchasing, financial information, accounting, marketing,
> business plans, strategies, business methods, customer
> information, contracts, merchandizing, licensing and any other
> formula, pattern, plan, process, device, data, information or
> compilation of information.[14]

Examples of IBC's Confidential Information in the possession of Schrider is attached hereto as Exhibit 6. Examples of documents created by Schrider that were derived from IBC's Confidential Information is attached hereto as Exhibit 7. Given that Schrider created a large volume of documents derived from IBC's Confidential Information, it is likely that Schrider is in possession of additional Confidential Information that was obtain or created without the knowledge or consent of IBC.

In the NDA, Schrider agreed to the following:

- Pursuant to Paragraph 2: Ensure that his agents who come to know IBC's Confidential Information keep it strictly confidential and not be

---

[14] [Schrider NDA, Ex. 1, ¶ 1.]

divulged to any third party and not make use of IBC's Confidential Information in any way without IBC's prior written consent;

- Pursuant to Paragraph 4: Not to disclose IBC's Confidential Information to any third parties or to use it for any purpose not authorized in writing by IBC;

- Pursuant to Paragraph 5: Not to, and to cause his affiliates, employees, agents or third parties not to, disassemble, reverse engineer, inspect or perform any chemical or physical analysis on any SuperLig® Products or other products supplied by IBC or a third party;

- Pursuant to Paragraph 5: Not to, and to cause its affiliates, employees or agents not to, manufacture or attempt to manufacture any of the SuperLig® Products or to copy the separations, chemicals manufacturing or metals refining technology disclosed by IBC;

- Pursuant to Paragraph 6: Only reproduce or summarize Confidential Information to the extent necessary to carry out a prospective or actual business relationship IBC; and

- Pursuant to Paragraph 6: Upon the written request of IBC, return all documentation, samples and other items representing or incorporating the Confidential Information, and all copies thereof, that are in Schrider's possession or control.

Schrider has breached the NDA by failing to return the Confidential Information to IBC. On September 12, 2019, IBC requested in writing that

Schrider return IBC's Confidential Information.[15] On September 23, 2019,

Schrider responded with a refusal.[16]

Schrider has repeatedly breached the terms of the NDA by

disclosing and using IBC's Confidential Information and allowing Ucore, the

company for which he is COO, to disclose and use it. For example, IBC's

Confidential Information has been disclosed and/or used, without IBC's

permission, in connection with, but not limited to, the following:

- Response to a request for information ("RFI") from the Defense Production Act ("DPA") Title III Office, which proposed "the advancement of the [Bokan Mine] and REE processing and separation plant in Southeast Alaska,"
- Combination of SX and MRT, which "suggests a layering of nanotechnology on top of traditional SX, delivering a derivative technology ("Hybrid SX") that is theoretically the best of all worlds,"
- Solvent extraction alliance partner to be announced "in the coming weeks," as published on September 4, 2019,
- Commencement of the engineering steps to incorporate solvent extraction into the overall Bokan process flow sheet,

[15] [Schrider Correspondence for Return of Confidential Information, Ex. 8.]
[16] [Id.]

- Alignment with potential commercial partners, specifically led by Schrider and Ucore's other senior executives over the past ten months, to carry out Ucore's planned initiatives,
- Extensive meetings with all members of the 'Japanese 3' [Toyota, Honda, Nissan],
- Commerce Resources proposal to the Defense Logistics Agency,
- Testimony in front of the U.S. Senate and Ketchikan Gateway Borough Council as well as meetings with senior members of the Trump Administration, Congressional officials, and Alaskan officials,
- Discussions with the Alaska Industrial Development and Export Authority ("AIDEA"),
- High Priority Infrastructure Project designation,
- Establishment of a U.S. REE supply chain and feedstock determination,
- Development of coal refinement capabilities "in order to access the vast quantities of rare earth elements contained in the coal ash of Kentucky and West Virginia,"
- Discussions with the following:
    - 6th Wave Innovations,
    - Critical Materials Institute ("CMI")
    - National Energy Technology Laboratory ("NETL"),
- Determination of required electrical services and water treatment for the Kentucky and Alaskan SMCs,
- Site scoping and permitting due-diligence for the land purchase agreement ("LPA") in Ketchikan, Alaska,
- Engineering and economic studies, production throughput schedules and site analyses for the Alaskan and other SMCs,
- Due diligence studies for the Alaskan SMC being conducted by R&M Engineering of Ketchikan, Alaska,

- Alaskan SMC due diligence, including: (i) specific site selection within the Ketchikan Gateway Borough, (ii) design engineering, (iii) construction costing (CAPEX), (iv) finalization of input feedstocks from the short-list of competing alternatives, (v) operational costing (OPEX), and
- Advanced engineering and design program for the Alaskan SMC:
  - Feedstock – Reconfirmation of feedstock geochemistry and down selection of candidate feedstocks; feedstock test work; consideration of individual and blended production lines over the life of the plant.
  - Plant Requirements – Finalization of the plant requirements document.
  - Process Flow Diagrams – MRT & non-MRT.
  - Process & Instrumentation Diagrams – MRT & non-MRT.
  - Arrangement Layouts & Details – MRT, non-MRT & on-site analytical laboratory.
  - Equipment and Chemical Lists – Including purchase specifications (categorized by lead time) – MRT, non-MRT & laboratory.
  - Programmable Logic Controller (PLC) Engineering – MRT & non-MRT.
  - Utilities – Finalization of the facility dimensional, power, compressed air, hvac, water, and environmental requirements.
  - Economic Model – Routine updates & finalization of engineering inputs to the project economic model and schedule.
  - Codes – Building code & zoning requirements.
  - Site Specific Studies, including:
    - Boundary survey and topography
    - Soils report
    - Site plan design

29

- ▪ Architectural rendering
- ▪ Review of mechanical, electrical & environmental requirements
  - o Facility Requirements – Finalization of the facility requirements document.
  - o Design Engineering – Architectural, civil, electrical and mechanical design drawings & specifications.
  - o Equipment Lists – Including purchase specifications (categorized by lead time).
  - o Permit Applications
  - o Economic Model – Routine updates & finalization of engineering inputs to the project economic model and schedule.

Schrider's NDA also supports Plaintiff's right to injunctive relief.

Pursuant to Paragraph 10 of the NDA signed by Schrider, Schrider

"acknowledge[d] that disclosure or use by it of the Confidential Information

of [IBC] could cause irreparable harm and significant injury that may be

difficult to ascertain. Accordingly, [Schrider] agree[d] that **[IBC] shall have**

**the right to seek an immediate injunction enjoining any breach or**

**threatened breach of this Agreement**" (emphasis added).[17]

---

[17] [Schrider NDA, Ex. 1, ¶ 10.]

Pursuant to Paragraph 6 of Shrider's NDA, "[u]pon written request of [IBC], [Schrider] **shall return to [IBC] all documentation, samples and other items representing or incorporating the Confidential Information of [IBC], and all copies thereof, that are in [Schrider]'s possession or control**" (emphasis added).[18]

The foregoing contractual terms clearly state that Schrider agreed to be enjoined as set forth above if he did not perform any of the provisions contained in the NDA. Without an injunction, IBC's proprietary and Confidential Information and its trade secrets are at risk of misappropriation, creating a presumption of irreparable harm.

**B. Schrider and 6th Wave Have Misappropriated IBC's Trade Secrets, or Have Threatened Misappropriation of IBC's Trade Secrets, as Defined Under the UTSA.**

"Under our Uniform Trade Secret Act, a prima facie case of misappropriation is established on the basis of two essential elements:

[18] [Schrider NDA, Ex. 1, ¶ 6.]

31

existence of a protectable 'trade secret' of a plaintiff and demonstration of

'misappropriation' by a defendant." *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶

24, 364 P.3d 1013 (2015), citing Utah Code § 13-24-2.

> "Improper means" includes theft, bribery, misrepresentation,
> breach or inducement of a breach of a duty to maintain
> secrecy, or espionage through electronic or other means.
> "Misappropriation" means:
>
>   (b)   disclosure or use of a trade secret of another without
>       express or implied consent by a person who:
>
>       (i)    used improper means to acquire knowledge of the
>     trade secret; or
>
>       (ii)   at the time of disclosure or use, knew or had
>         reason to know that his knowledge of the trade
>         secret was:
>
>         (B)  acquired under circumstances giving rise to
>           a duty to maintain its secrecy or limit its
>           use; or
>
>         (C)  derived from or through a person who owed
>           a duty to the person seeking relief to
>           maintain its secrecy or limit its use; or
>
>  "Trade secret" means information, including a formula,
> pattern, compilation, program, device, method, technique, or
> process, that:
>
> (a)    derives independent economic value, actual or potential,
>       from not being generally known to, and not being
>       readily ascertainable by proper means by, other persons
>       who can obtain economic value from its disclosure or

> use; and
>
> (b)   is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code § 13-24-2.

### *IBC has protectable trade secrets, as defined by the UTSA.*

IBC's trade secrets and Confidential Information in the possession of Ucore consist of information for lab testing of the individual rare earth elements as well as design, construction and operation of a pilot-scale rare earth elements ("REE")  separation plant, an industrial-scale platinum group metals ("PGM") separation plant, and early design information for an industrial-scale REE separation plant (collectively, "Separation Plants").[19]

Schrider and other agents created additional Confidential Information derived from IBC's proprietary information, such as flow sheets and notes. The following are examples for which Schrider sought IBC's inputs:

[19] [Confidential Information, Ex. 6.]

a. "Notional Flowsheet of the Vineyard Facility PP Upgraded for Retail Small Scale Production - *To Be Vetted by IBC*". This flowsheet had a proposed Phase A and two Phases B for the commercial production of REE for a rare earth company or off-spec material using an upgraded pilot plant. The Phases were color coded in rose, blue and green. It was dated August 9, 2017.

b. A detailed spreadsheet portfolio, containing five separate spreadsheets, stamped "Draft Document Still Under Development" including a detailed financial analysis of the prospective treatment of feedstocks using MRT from two rare earth companies. The spreadsheet used blue, yellow and beige cells to highlight key parameters and inputs.

c. A multi-page detailed color-coded gantt chart, listing milestones, tasks, timelines and responsibilities for IBC and Ucore personnel for the PGM project.[20]

In addition, based on press releases and other public information, Schrider and other personnel created Confidential Information derived from IBC's proprietary information for proposals to government agencies and in preparation for testimony in front of government personnel; as well as creating documents relating to cost estimates, environmental requirements,

[20] [Derived Confidential Information, Ex. 7.]

raw materials, vendors, plant requirements, arrangement layouts and

details, engineering designs, drawings, concepts, technical specifications,

financial information, customer information, chemicals and equipment lists,

programmable logic controller (PLC) engineering, utilities, materials of

construction, budgets, size estimates, electrical requirements, waste

estimates, facilities requirements, permits, strategic assessments, economic

models, marketing plans, gantt charts, diagrams and flow sheets of

element separations, mass balances, and feedstock assessments.[21]

IBC has undertaken reasonable methods to maintain the secrecy of

its intellectual property, (collectively, "Security Measures") including, without

limitation:

> a. Keeping the trade secret and Confidential Information in locked facilities with numbered and tracked keys, and only authorizing certain individuals to make additional keys;
> b. Allowing access to employees only by using a FOB assigned to them;

[21] [Id.]

c. Password-protecting email accounts, computers, and data storage with secure computer and network systems;

d. Securing the building with alarm systems;

e. Requiring confidentiality agreements from visitors, customers, consultants, vendors, and prospective employees prior to hiring, who are exposed to the trade secret and Confidential Information;[22]

f. Prominently displaying its confidentiality disclosure at the sign-in desk;

g. Restricting access to its production and laboratory by separating its meeting rooms and bathrooms from its production, and laboratory;

h. Ensuring limited access to trade secret and Confidential Information by only sharing such information with individuals who have a need-to-know for their job function;

i. Requiring employees to maintain the confidentiality of all such information; and

j. Incorporating into contracts non-competition provisions and prohibitions against reverse engineering of IBC's products.[23]

IBC's trade secrets are comprised of both unknown and known elements that have accomplished an effective, successful, and valuable integration of those public elements such that IBC derives a competitive

[22] [Schrider NDA, Ex. 1.]
[23] [Izatt Dec., Ex. 2, ¶ 11.]

advantage from it. IBC's compilation of information is not generally known

or readily ascertainable to the public. Without IBC having disclosed such

information to Schrider, it would not have been known or readily

ascertainable. The uniqueness of trade secrets and Confidential Information

cannot be overstated and can appropriately be compared to attorney work

product in that it consists of writings, notes, memoranda, research and

confidential materials that reflect the impressions of IBC's highly trained

employees, most of whom have advanced degrees in chemistry and

chemical engineering, conclusions, and opinions developed for and in

anticipation of a specific project. Ucore contracted IBC specifically to

analyze the solution in which ore Ucore represented to be from the Bokan

Mine was dissolved ("Bokan Solution"); run experiments to demonstrate

bench (laboratory) scale proof of concept for the separation processes of

REE from the Bokan Solution; conduct full load, wash, and elution cycles;

and create flow sheets giving the sequence for the separations.[24] The

analysis and testing processes as well as the pilot plant flow sheets are

described in detail in Interim Report 1, the Second Interim Report, and

corresponding tables and figures.[25] IBC's suite of processes, alone, are

trade secrets owned exclusively by IBC. After analysis and testing, IBC

began engineering and constructing the Pilot Plant. IBC completed plans

for an industrial-size PGM plant, including business strategy and analysis,

separation process, warehouse layout, process flow charts, material lists,

instrumentation and equipment specifications, calculated proforma

financials, contact lists, and strategic selection of a location to construct

the plant are additional trade secrets in the hands of Ucore. This initial

process was time, effort, and resource consuming.

### *Misappropriation of IBC's Trade Secrets by Schrider and 6th*

[24] [Confidential Information, Ex. 6.]
[25] [Id.]

*Wave*

Schrider has misappropriated IBC's trade secrets by disclosing them to 6th Wave, governmental entities, the public, and others without IBC's consent. Ucore told IBC that 6th Wave "does exactly what IBC does" and threated that 6th Wave is an alternative to IBC.[26] 6th Wave describes itself as a nanotechnology company focused on extraction and detection of target substances at the molecular level, whose main laboratory is located in Salt Lake City, Utah. Ucore has announced that "[its] vision and plan is to become a leading nanotechnology company…"[27] 6th Wave is a direct competitor of IBC. 6th Wave underwent a reverse merger with Atom Energy, Inc. so that 6th Wave can list on the TSX.[28]  Atom Energy is connected to a company that supplies solvent extraction technology, competing with IBC. The closing of the merger occurred in the offices of

[26] [Izatt Dec., Ex. 2, ¶ 7.]
[27] [July 25, 2019 Ucore Press Release, Ex. 10.]
[28] [https://www.newsfilecorp.com/release/47228/Atom-Energy-Announces-Name-Change-to-Sixth-Wave-Innovations-Inc]

Ucore's legal firm in Halifax, Nova Scotia.[29] There is evidence that

Schrider's colleagues at Ucore now work for 6th Wave.[30] Byron Fillmore,

who was the VP of Marketing for Ucore until he stepped down as part of

a settlement agreement with the Canadian securities authorities, has

procured a contest to design a new logo for both 6th Wave and Atom

Energy.[31] Ucore even owns the domain name 6thwave.com.[32] Ucore is

currently the lessor of the property in Vineyard, Utah in which the Pilot

Plant is stored, and Schrider can grant 6th Wave access at any time to

further misappropriate IBC's trade secrets or attempt to reverse engineer

the technology in the Pilot Plant. Further, an agent of Ucore has brazenly

confirmed execution of the misappropriation by Schrider:

> **Ucore can engineer / design to a certain degree and not be
> starting from "scratch", post-OTP win. Just plug in the final**

[29] [Atom Energy Inc, and 6th Wave Agreement and Plan of Merger, page 10, https://sedar.com/GetFile.do?lang=EN&docClass=14&issuerNo=00026079&issuerType=03&projectNo=02823063&docId=4389327]
[30] [Discussion Boards, Ex. 3.]
[31] [https://nssc.novascotia.ca/enforcement-proceedings/fillmore-byron-millard]
[32] [6thwave.com WHOIS Information, Ex. 5.]

**data, formulas, flip the switch and watch her go**.33



**my69z** (527)                3 minutes ago 6 Reads          👍 0
User Actions ▾               Post# 30150437

### RE:RE:RE:RE:RE:An Overlooked Fact

We have the pilot plant reports also. Not results.....also reports that IBC was submitting on a monthly basis to Schrider for review. Ucore can engineer / design to a certian degree and not be starting from "scratch", post-OTP win. Just plug in the final data, formulas, flip the switch and watch her go --- Ucore hinted in December of filling any Izatt void. : )

Schrider used improper means to acquire knowledge of the trade secrets by misrepresenting his intentions with regard to creating a joint venture with IBC and breaching his duties under the NDA. Schrider acquired IBC's trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use, namely, the NDA.34 Schrider, at the time that he signed the NDA, was an agent of Ucore. Schrider is now the chief operating officer of Ucore.

6th Wave knew or had reason to know that Schrider owed a duty to

33 [Discussion Boards, Ex. 3.]
34 [Schrider Nondisclosure Agreement, Ex. 8.]

IBC to maintain the secrecy or limit the use of the trade secrets. Many of the contacts, supply chain, and sourcing, of which Schrider and 6th Wave now have possession, came from the receipt of IBC's trade secrets.

Schrider is not a chemist or a chemical engineer. Schrider's background lies in naval architecture and marine engineering; only in May 2019 did Schrider finish an online degree in mining engineering at the University of Arizona.[35] The other principals of Ucore do not possess scientific or technical backgrounds in chemistry or chemical engineering. Despite Schrider's and Ucore's void of knowledge or expertise in chemistry, chemical engineering, or separations technology, Ucore announced that its vision and plan is to transition to become a leading advanced technology company that provides mineral separation products and services to the mining and mineral extraction industry.[36] The evidence supports a finding

---

[35]
[https://commencement.arizona.edu/sites/commencement.dd/files/UA_Commencement_2019_Program.pdf]
[36] [August 22, 2019 Ucore Press Release, Ex. 10.]

that Schrider has or will imminently disclose or use IBC's trade secrets with 6th Wave and presents serious issues on the merits which should be the subject of further litigation.

The threatened harm is real and immediate. Schrider's company, Ucore, has shifted its marketing focus very recently and announced that "Ucore's vision and plan is to transition to become a leading advanced technology company that provides mineral separation products and services to the mining and mineral extraction industry."[37] Ucore's CEO stated that, "[b]y extrapolating the knowledge gained from the SuperLig® One rare earth pilot plant, we have a clear plan of execution for the Alaska SMC."[38] Ucore has sold the Pilot Plant to Orca, and it has entered into a joint venture with the Critical Materials Institute ("CMI").[39] CMI, a direct competitor of IBC, uses molecular design to create ligands for REE

[37] [Id.]
[38] [May 7, 2018 Ucore Press Release, Ex. 10.]
[39] [October 11, 2018 Ucore Press Release, Ex. 10.]

separations, and its mission is to develop solutions to domestic shortages

of REEs and other materials.[40]

> **Ucore can engineer / design to a certain degree and not be starting from "scratch", post-OTP [Option to Purchase] win. Just plug in the final data, formulas, flip the switch and watch her go…. We have the keys to the building, pay the rent and own the pilot-plant. Under the IBC Agreements, Ucore could share all SuperLig-1 with DPA [Defense Production Act] staff.[41]**



my69z (527)
User Actions ▼

3 minutes ago 6 Reads
Post# 30150437

👍 0

**RE:RE:RE:RE:RE:An Overlooked Fact**

We have the pilot plant reports also. Not results.....also reports that IBC was submitting on a monthly basis to Schrider for review. Ucore can engineer / design to a certian degree and not be starting from "scratch", post-OTP win. Just plug in the final data, formulas, flip the switch and watch her go --- Ucore hinted in December of filling any Izatt void. : )

> **We have the keys to the building, pay the rent and own the pilot-plant. Under the IBC Agreements, Ucore could share all SuperLig-1 with DPA staff…. you can reasonably think the CEQ's willing to go to bat for "Bokan permitting" an SX, is only because what the DOD / DPA decided on MRT.[42]**

---

40 [Izatt Dec., Ex. 2, ¶ 9.]
41 [Discussion Boards, Ex. 3.]
42 [Id.]

## I look @ " hybrid SX " as DPA approving MRT

 **my69z** (539) | September 20, 2019 10:14 pm

We have the keys to the building, pay the rent and own the pilot-plant. Under the IBC Agreements, Ucore could share all SuperLig-1 with DPA staff. Look at DPA website ----- it says they will also design your project, if needed. Now if you believe the CEQ ( federal permitting agency), DOD and their DPA department all talk to each other, then you can reasonably think the CEQ's willing to go to bat for "Bokan permitting" an SX, is only because what the DOD / DPA decided on MRT. An HPIP approval for Bokan, will say it all ------ the DOD doesn't "need" Ucore to be SX based. I also don't believe the DPA wants it either and this is all because of Izatt. But they all know he's going to lose MRT. So plenty of time to win and add-on MRT and again, if DOD / DPA also think that, then we'll see an HPIP approval. DPA is not, about economics ------ it even says that on their website. [43]

   This is all part of Ucore's playbook, and it is not difficult to anticipate Ucore's next move. When IBC was still under Ucore's spell and believed that a joint venture would be formed, Ucore, through Schrider, sought analysis from IBC's employees regarding each of these and other companies that have competing capabilities. In 2017, Schrider revealed to members of IBC's team that he had "a very speculative document we have developed over time which attempts to capture and analyze current REE feedstock opportunities."[44] Schrider developed the document "for a

---

[43] my69z is Christopher Campbell, who speaks regularly to Ucore executives and posts frequently in public forums about IBC and Ucore. It appears that Ucore drafts posts for him to publish. [Id.]
[44] [August 28, 2017 Trade Secret Email, Ex. 9.]

7200 SF building Randy Johnson [owner of Orca and Ucore's largest

shareholder] owns in Ketchikan."[45] Very specifically, Schrider asked for

commentary on feedstock from a rare earth processor and IBC competitor

for "500 of the 1200 tons of concentrate to be produced per annum,

starting in 2019," to which IBC provided answers and technical details.[46]

As discussed in greater detail, *infra*, Ucore has been aligning "with

potential commercial partners in support of these planned initiatives."[47]

Ucore is also attempting to coin a new term to describe the new "hybrid"

technology incorporating IBC's trade secrets and Confidential Information

that it plans to deploy: "The combination of SX and MRT suggests a

layering of nanotechnology on top of traditional SX, delivering a derivative

technology ('Hybrid SX') that is theoretically the best of all worlds."[48] In

addition to Ucore's proposal to form a three-way joint venture with an IBC

[45] [Id.]
[46] [Id.]
[47] [September 4, 2019 Ucore Press Release, Ex. 10.]
[48] [Id.]

competitor and Ucore's recent press releases, Ucore's intent to compete

with IBC using IBC's own Confidential Information and trade secrets

disclosed to Schrider, is real and imminent.

On May 7, 2018, a road map of Schrider's intent to misappropriate

IBC's trade secrets was revealed by Ucore. The roadmap detailed

proposals and testimony to the US and Alaskan governments, cost

estimates, environmental requirements, chemicals and equipment lists,

materials of construction, budgets, size estimates, electrical requirements,

waste estimates, strategic assessments, marketing plans, advanced

engineering and design program, charts, diagrams and flow sheets of

element separations, mass balances, engineering diagrams, mass

balances, economic scenarios, and feedstock assessments.[49] A clear intent

to misappropriate IBC's Confidential Information was indicated: "By

extrapolating the knowledge gained from the SuperLig® One rare earth

[49] [May 7, 2018 Ucore Press Release, Ex. 10.]

pilot plant, we have a clear plan of execution for the Alaska SMC."[50]

Ucore also falsely announced that it had "engaged . . . IBC to commence advanced engineering and design procedures for the U.S. Specialty Metals Complex (SMC) to be constructed in Ketchikan, Alaska."[51] This plan has been accelerated by the Trump Administration's initiatives to reduce dependence upon China in the REE sector.

Ucore VP of Project Development, MacGillivray, "explained that the facility will not be energy intensive. This was confirmed at a subsequent meeting with KPU [Ketchikan Public Utility] senior staff members and Ucore, where all parties were confident that the power needs were well within KPU's existing capacity."[52] MacGillivray's statement is completely without basis, misleading, and potentially false, but it appears that Ucore gave Ketchikan Public Utility estimates provided by IBC to Schrider for a

[50] [Id.]
[51] [Id.]
[52] [November 26, 2018 Ucore Press Release, Ex. 10.]

completely different type of plant designed to separate platinum group metals ("PGM"), not REE's. Schrider had asked this very question: "Any best guess on how many kilowatts of power will be required for the Line 1 plant?" and IBC did indeed provide estimates.[53] IBC has never been engaged by Ucore for any purpose related to the Alaska SMC, has not entered into any engineering contracts with Ucore since 2016, and has not performed any work for Ucore since October 2017.[54] Despite IBC's public correction of their false statement, Ucore continues to perpetuate the fraud that engineering has commenced. Ucore's plan has been accelerated by the Trump Administration's initiatives to reduce dependence upon China in the REE sector.

In the past few weeks, Ucore has made numerous public statements that signal immediate and irreparable harm to IBC through Ucore's

[53] [Confidential Information, Ex. 6, IBC000332.]
[54] [Izatt Dec., Ex. 2, ¶ 10.]

49

misappropriation of IBC's trade secrets Confidential Information obtained by

Schrider. In recent months, President Trump has issued executive orders

that identified REE's as critical to United States and signaled an intent to

fund domestic sources of those commodities.55 On July 22, 2019, he

issued five Presidential Determinations Pursuant to Section 303 of the

Defense Production Act of 1950 ("DPA"), stating that "the domestic

production capability for separation and processing of Heavy Rare Earth

Elements is essential to the national defense."56 A request for information

("RFI") was then issued under the DPA Title III Office.

On August 22, 2019, Ucore announced that it had formally

responded to the RFI. "The RFI response proposed the advancement of

---

55 Pursuant to Executive Order 13817, "A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals," the Secretary of the Interior has identified 35 mineral commodities deemed critical, which include the platinum group metals and the rare earth elements group. [Federal Register, Vol. 83, No. 97, Friday, May 18, 2018, https://www.federalregister.gov/d/2018-10667]
56 [Federal Register, Monday, July 22, 2019, https://www.whitehouse.gov/presidential-actions/presidential-determination-pursuant-section-303-defense-production-act-1950-amended-2/]

the Bokan-Dotson Ridge Rare Earth Project's (the 'Bokan Project') mine and REE processing and separation plant in Southeast Alaska."[57] On September 4, 2019, additional information was revealed:

- "Specifically, these include the capacity of separation and processing of HREE to meet the needs of modern U.S. military platforms – critical materials available at Bokan, and capabilities that Ucore is in the advanced stages of developing in Southeast Alaska."
- "A 30-month plan for advancement of shovel-ready initiatives associated with final engineering and permitting for the Bokan HREE mine."
- "A 12-month plan to advance the engineering of the first physical component of the Bokan-Dotson Ridge RE Project, the Alaska Strategic Metals Complex ('Alaska SMC')."
- "[T]o deliver an SX-based proposal for early stage development, commencing immediately, without the involvement of IBC… but does not preclude the use of MRT in the mid term."
- "The combination of SX and MRT suggests a layering of nanotechnology on top of traditional SX, delivering a derivative technology ('Hybrid SX') that is theoretically the best of all worlds."
- "[A] largely "off the shelf" technology which can be deployed with little or no delay."

[57] [August 22, 2019 Ucore Press Release, Ex. 10.]

- Ucore has been aligned "with potential commercial partners in support of these planned initiatives."
- "We encourage you to look for the announcement of our SX development alliance, in keeping with DPA Title III expectations, in the weeks ahead."[58]

Opaquely referring to IBC's Confidential Information and trade secrets, the announcement goes on to "expedite its anticipated ramp up" with its "largely 'off the shelf' technology which can be deployed with little or no delay."[59] The phrase "off the shelf" has been used by Schrider and other principals of Ucore before and clearly refers to IBC's technology. Ucore's CEO stated that IBC has "60 pre-developed ligands *on the shelf*" and that Ucore is commercializing this "catalog of products."[60] All of this is "happening very quickly."[61] Ucore blatantly admits in press releases to its shareholders and potential investors that IBC's technology was included in the response to RFI. If Schrider's intent was not clear enough, it was

[58] [September 4, 2019 Ucore Press Release, Ex. 10.]
[59] [Id.]
[60] [Id.]
[61] [September 10, 2019 Ucore Press Release, Ex. 10.]

clarified without a doubt that "[i]t is Ucore's plan to utilize MRT as a green, efficient, and transformative nanotechnology employed for high purity REE separations at Ucore's planned Alaska SMC" and that it plans to incorporate MRT "into the Alaska SMC's intended hybrid-technology design."[62] Additionally, Ucore does not possess its own technology, trade secrets, patents, or other technical capabilities, so there is no question that IBC's trade secrets and Confidential Information have been or imminently will be disclosed and misappropriated by Schrider, Ucore, 6th Wave, and their partners.

Ucore has announced that it is transitioning from a mining company into a technology company.[63] Ucore is currently raising $28.41 million to put this plan into action.[64] Schrider's main goal, then, is to use IBC, an IBC competitor, likely 6th Wave, or invest the company funds to acquire

[62] [Id.]
[63] [Id.]
[64] [Rights Offering Circular, Ex. 11.]

53

technology in order to develop a processing plant, capable of treating

third-party rare earth containing materials as well as, eventually, ore from

the Bokan-Dotson Ridge project, should it ever prove viable. It would be

detrimental for 6th Wave or another competitor of IBC to access IBC's

trade secrets and misappropriate them or reverse engineer IBC's

technology by extrapolating the Confidential Information and trade secrets

that Schrider can provide.   The threat that Schrider will disclose or use

IBC's Confidential Information and trade secrets is real, as principals of

Ucore have been quoted in articles and interviews that Ucore has "a

number of JV opportunities under development… with major American,

European and Japanese parties."[65] Ucore also just revealed, on September

10, 2019, that it has "completed numerous meetings with industry front-

runners, both in America and Japan, exploring opportunities such as

supply offtake agreements" and "Ucore has in fact had extensive meetings

[65] [September 10, 2019 Ucore Press Release, Ex. 10.]

with all members of the 'Japanese 3 [Toyota, Honda, and Nissan].'"[66] On

September 4 and September 10, 2019, Ucore encouraged its current and

prospective shareholders "to look for the announcement of our SX [solvent

extraction technology] development alliance, in keeping with DPA Title III

expectations, in the weeks ahead." In the same announcements, Ucore

also announced that "Over the past ten months, [Ucore's] senior

executives (Pat Ryan, Chairman; Jim McKenzie, CEO & President; Peter

Manuel, Vice-President & CFO; and Mike Schrider, COO) along with the

rest of [its] management team and [its] major shareholder, Randy Johnson,

have aligned Ucore with potential commercial partners in support of these

planned initiatives." Just yesterday, Schrider is quoted in a Ucore press

release stating that Ucore "has a deliberate plan in place and is

strategically executing on that plan through the support of Federal and

State governments, as well as our shareholder base, who collectively

[66] [Id.]

55

share our vision of mineral independence from China."[67] Based on this, it is likely that Schrider has already shared or imminently will share IBC's trade secrets and Confidential Information with 6th Wave and the prospective SX development alliance partners for services related to the separation and purification of REE's. IBC has established a prima facie case of misappropriation, which entitles it to presumption of irreparable harm and serious issues on the merits which should be the subject of further litigation. This threat of misappropriation to IBC's trade secrets and Confidential Information is not justifiable, and Schrider and 6th Wave must be enjoined from competing to ensure that Schrider, Ucore, 6th Wave, and any of these contemplated parties cannot misappropriate IBC's trade secrets.

**C. Schrider and 6th Wave Have Been Unjustly Enriched.**

"A person is unjustly enriched if (i) he received a benefit, and (ii)

[67] [October 17, 2019 Ucore Press Release, Ex. 10.]

his retention of that benefit would be unjust." *Jeffs v. Stubbs*, 970 P.2d

1234, 1246 (Utah 1998), *see Flooring Systems, Inc. v. Radisson Group,*

*Inc.*, 160 Ariz. 224, 772 P.2d 578, 581 (1989) (en banc). Schrider and 6th

Wave have both been unjustly enriched by IBC. Schrider and 6th Wave

received a benefit from IBC through the collection of IBC's Confidential

Information and trade secrets. Approximately CAD$13.5 was raised to fund

the reverse merger of 6th Wave with Atom Energy.[68] Schrider has been

doubly enriched by gaining access to and sharing IBC's Confidential

Information and trade secrets with Ucore to use nefariously. When

Schrider first received IBC's Confidential Information and trade secrets, he

was only an independent contractor consultant for Ucore. Now, he is a top

executive of Ucore with the title of Chief Operating Officer. Schrider was

also granted 200,000 stock options. Schrider's and 6th Wave's retention of

the benefits received would be unjust because they were only retained

[68] [http://www.atomenergyinc.com/news/agyjul262019.pdf]

57

due to Schrider's violation of the NDA and by improper means to acquire knowledge of IBC's Confidential Information and trade secrets.

Schrider's continuing employment and survival of Ucore relies on the misappropriation of IBC's Confidential Information and trade secrets. After its recent spate of grandiose press releases describing its "American grand slam of REE development," Ucore announced that it will be offering rights (the "Rights Offering") to holders of its common shares.[69] On September 10, 2019, in conjunction with the Rights Offering Circular seeking to raise funds, Ucore stated that it only has "sufficient working capital to last one month."[70] Ucore is slated to realize gross proceeds of $28.41 Million if it sells all of the shares available through the Rights Offering.[71] Under the circumstances, Schrider and 6th Wave have been unjustly enriched.

[69] [Rights Offering Circular, Ex. 11; September 10, 2019 Ucore Press Release, Ex. 10.]
[70] [Rights Offering Circular, Ex. 11.]
[71] [Id.]

## CONCLUSION

For the foregoing reasons, IBC respectfully requests that the Court enter a preliminary injunction binding and enforcing against Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, ordering that:

1. Defendants shall be enjoined from misappropriating IBC's Confidential Information and trade secrets;
2. Defendants shall maintain the secrecy and confidentiality of IBC's Confidential Information and trade secrets and other proprietary information, including restraint from disclosing such information to the public, Defendants' past, current, prospective, or future business associates, investors, subsidiaries, and acquaintances;
3. Defendants shall account for and return, and cause all parties to whom they have disclosed any trade secrets or Confidential Information to account for and return, to IBC all IBC intellectual property, including its trade secrets, Confidential Information and other confidential documents, data or information in their possession, custody or control, including any copies thereof or any documents, data or information that references or uses in any way IBC's Confidential Information and trade secrets;
4. Defendants shall return, and refrain from using, all Confidential Information and trade secrets pursuant to the Nondisclosure Agreement; and

5. Defendants shall be precluded from in any way conducting, transacting any business with, or assisting any person or entity that utilizes or seeks to utilize IBC's Confidential Information and trade secrets.

Dated: October 18, 2019.

DEISS LAW PC

/s/ Andrew G.

Deiss

Attorney for the

Plaintiff